Case number 17-1025-8L. Green Gas Delaware Statutory Trust Appellate, Methane Bio LLC, Tax and Address Partner v. Commissioner of Internal Revenue Service. Mr. Kovish for the Appellates, Ms. Rubin for Appellate, Commissioner, IRS. May it please the Court, The tax court below applied a double standard in this case, and that double standard was a legal error that permeated the lower court's opinion. Congress established a tax credit for the production and sale of non-conventional fuels, including landfill gas. Green Gas and Pontiac claimed those credits from 24 landfills, all of which had landfill gas collection facilities. Some of those facilities were connected to gas or electricity equipment, some were not. The production tax credit statute makes no distinction between those two. The tax court created such a distinction out of thin air, and on that basis disallowed all production tax credits from all the landfills not connected to such gas to energy equipment. This was a reversible legal error. The tax court then compounded that error by holding Green Gas and Pontiac's landfills to a double standard of substantiation as well, holding that non-electricity generating landfills were subject to a higher substantiation standard than electricity generating ones. Further, the tax court imposed negligence penalties based on Green Gas and Pontiac's alleged failure to meet that artificially heightened standard of substantiation for the non-electricity generating landfills. Can I just ask a question about the statutory, your understanding of the credit? Your understanding is that you can get a credit for building pipes that vent the gas into the atmosphere and that burn off the gas. Well, the credit is for the production and sale of landfill gas. Yeah, I understand that. But in the bottom line of the scheme, all that happens in most of these circumstances is the gas is either blown off into the air or it's flared off, burned off. Is that right? Well, I think there are many ways you can do it. It could be vented, it can be flared, or it could be connected to some sort of generator or other thing. Yeah, you have that in some, but you don't have that in most of the operations. That's correct. But that's not necessary under Section 45K. Well, 45K says you're supposed to be, this is a credit for producing fuel, right? That's correct. Fuel is something that can be used to turn into energy. All you're doing is venting off and burning the gas. Am I right? That's all that happens here. Well, the production of landfill gas, which untreated landfill gas by itself is fuel, it's qualified fuel under the section. It depends on what the meaning of fuel is. Usually fuel is something that can be turned into energy, and when you blow it off into the air, it can't be turned into energy. It's gone. Ah, but the sale does not take place after the gas has already been vented. Maybe, but what was Congress's, what do you think, when Congress used the word fuel, what do you think they meant? How would it apply to a situation in which the gas is just wasted? The whole point, at least by the titles of the statute, this idea is to be producing some kind of alternative fuel. And if all you do is blow it off into the air, it's not really an alternative fuel. It's just a way of polluting the atmosphere. I think that's putting the cart before the horse. Which part's the cart and which part's the horse? The act of production and the sale is what's creditable. What the buyer does with the gas afterwards is not an issue when it comes to the statute. There's a totally different tax credit, Section 45, which is a tax credit for electricity generation from landfill gas and other non-conventional sources. Who's the buyer here? I'm sorry? Who is the buyer? The buyer here was RTC, Resource Technology Corporation. Jim? Let me just ask you about something in your brief, just to follow up on the Chief Judge's questions. I understood your brief as saying that when first adopted in 1980, that the statute, the credit did work exactly the way Chief Judge Garland said, right? It was for fuels, correct? It was for the producing of fuels. That's what you say in your brief. Yes, that's right. But then you go on and say, but that subsequent legislative history shows that this was made available, Congress decided to make this available for the broader purpose, the broader purpose of releasing gas just to comply with environmental regs, even if it wasn't turned into fuel, right? Yes, but I would make a distinction that in 1980, part of the— But you do say that in your brief, correct? Yes, with this distinction, that in 1980, the idea was to promote nascent technologies for developing alternative fuels. This is a tax subsidy. Right, but under the original enactment as you see it, you would not have been entitled to this tax credit, correct? That's not true, Your Honor. We would still be because landfill gas, straight from the landfill, contains methane as the tax court correctly held, is a qualified fuel under the production tax credit. And so, yes, and it can actually be used. There's discussion in the record of untreated landfill gas being used in something called a leachate development. Leachate is liquid that comes off of landfill. It's really disgusting. There's a way to treat that using landfill gas. Straight from the landfill, you ignite it. It evaporates the leachate. Why would Congress have based this calculation of the credit on a barrel of oil equivalent if it had had in mind that methane released into thin air would qualify? Well, I think because they wanted to encourage people to go into the business. Keep in mind that building a landfill— Wait, wait, what? Why would they have used the barrel of oil equivalent as the measure? Because they wanted to get to the— Doesn't that sound like what Congress had in mind was producing a fuel that could be used? Yes, which landfill gas can be. But I think the barrel of oil equivalent goes to the methane content of whatever, of the gas, and the same way for the other types of nonconventional fuels that are addressed in the production tax credit statute. So I do believe that in 1980, what Congress intended to do was to support people in entering the industry for developing landfill gas as a potential energy source. And that necessarily includes a subsidy element. That necessarily includes we're paying for the production of gas that may not all be used right away. That's not a question of all. Is there any indication that any of these plants, leave aside the gas to electricity ones, were going to be used for anything else? Testimony of the record is that that was the original intention. There were that all of these were intended to be eventually gas to energy plants. There was financial difficulty for RTC, which led to a bankruptcy and— There was no—I mean, I can understand why Congress would have wanted you to build the pipes, but why get the credit until it actually does something? Well, it does do something, Your Honor. Yeah, it vents it into the atmosphere. Which is very important, Your Honor, and maybe I should step back and explain why. Landfill gas follows the path of least resistance. If you don't have these vents, the path of least resistance often is neighboring communities. And there's testimony in the record from the commissioner's expert about an incident in Madison, Wisconsin, where there was— But there was nothing in the statute suggesting that the purpose here is to prevent that kind of thing. The purpose is to create an alternative fuel, right? The purpose is—forget about the legislative history. Just because apparently government has a different view about that, even the legislative history you cite. But with respect to the statute itself, there's no suggestion that the purpose is some kind of environmental purpose, other than the environmental purpose of competing with oil and gas, regular oil and gas. If you look at the statute, the question is, are you producing qualified fuel? Are you producing landfill gas? And without question, the facilities that were in place in all 24 landfills were producing them. They were taking the landfill gas from down in the bowels of the landfill, bringing it up to the surface, which is the— So venting—allowing methane gas to escape from the landfill and go somewhere else is production. It is, yes. So why isn't the landfill owner the one that gets the credit here? If a landfill owner just allows it to vent into the community, is that also a production that qualifies? No, because there's no facilities facilitating that. And again, these vents— Are pipes a facility? Yes, absolutely. And these are not just holes in the ground. These are actual— Well, would a hole in the ground work? Why wouldn't a hole in the ground work? It'd do the exact same thing. I don't think a hole in the ground by itself would be a facility. All right, someone pokes with a stick to release it up. Is a stick a facility? I wouldn't think so. Why not? It's releasing the gas out of it. Because that is not producing it in the way that even a vent is. How? It's releasing it into the air. Because when you look at the vent, it's a pipe. It has perforations, especially design. The design is to provide a path of least resistance for the methane gas. I don't see the difference between— Going there and poking a stick, that's not going to accomplish that. Of course it is. It's going to loosen things up and create a path of least resistance that releases it into the air. So the stick's a facility. It's a hollow stick, so it's a teeny, weeny pipe. I wouldn't agree with that, and I think that that's pretty far from our case, where we actually have— This was not just a pipe, though. This was also a network. These were vents that were connected to header pipes, some of which were connected to flares, which is a method for treating the gas. That just burns it off. That destroys the gas. Well, that's important for environmental— Environmental reasons, but not for— And also, by the way, shows that landfill gas is fuel because it's burning. At what point in this travel through the pipe did RTC buy the gas? At the point of production. What's the point of production with the pipe? That's the point where it comes to the surface. So they didn't buy it before it came to the surface. That's correct. And when it came to the surface, it evaporated. So they bought it for the purpose of evaporating it up into the air and getting no money for it? That seems like not exactly profit-making on RTC's point of view. Well, it does save on compliance with environmental regulations, so there is an economic aspect to it. But that's not the purpose of the statute. It's dead. Wait, so you say—go back to what you just said. So it's produced at the surface. Beneath the surface, it's methane, right? Well, methane among other things, yes. Well, but it's methane, right? And when it goes through the pipes and goes into the air, it's methane. So what's produced? Well, the landfill gas itself is the methane in the landfill gas. But it was produced— Below the surface. Below the surface. Produced by the landfill. By the landfill. That's who produced the methane. It's a landfill. No, because the production in this—in terms of the facility producing landfill gas is the vent. Yeah, but no one would think of the word production as meaning releasing a gas that's already produced. You would say released. I would disagree with that because if you're looking at oil, for instance, oil in the ground, I can't say, well, there's oil in the ground. A bunch of dinosaurs died a million years ago. That's the production. I don't think that's right. The production is bringing it to the surface where it can be used in some way. And that's exactly what the statute was intended. And that's exactly what Green Gas and CONIAC did. These were all output contracts. And this is an important point, that because they're all output contracts, RTC agreed to buy all their output for, I think it was six-month periods. So the fact that they could use some or all or none of it really is irrelevant to the tax credit that the seller is entitled to. It has a tax credit for the seller. Could I ask about the substantiation question? I take it that that's an independent ground of the tax court's decision. That is, even if we were to agree with you on the statutory interpretation, we would still have to next go to the substantiation question. Isn't that right? Well, yes, but I would dispute that it's independent because what I think the court did is hold the electricity-generating landfills and the non-electricity-generating landfills to a double standard. That's a different question. I'm talking about independent of the statutory interpretation question. There's still a substantiation question for each of the two kinds of landfills. That's correct. Isn't that right? Yes. And we would still have to reach that even if we agreed with you with respect to the statute. That is correct, Your Honor. All right. And with respect to substantiation, it's a clear error standard on our part, right? Yes, although if the court, as here, made a legal error in its ruling, that, of course, would be essentially de novo. And the legal error you claim is that there was an inference for failing to call certain witnesses who died. That's one of them, Your Honor. That's a nice way to put it, but that wasn't what the court said. The court didn't say because they died, we're going to infer against them. What the court said was because they died, come up with some other witnesses, and your failure to produce other witnesses is used against you. Isn't that right? Well, what the court said is I want you to bring the people that prepared these logs. The only people that prepared those logs were the two witnesses that were dead. It's the only people who prepared them. There were other logs that were prepared by other people. There were other people who could have observed the logs were actually there. Approximately 85% of the logs were prepared by Mr. Walker and Mr. Johnson, the two deceased individuals. So those two individuals were beyond anyone's power to summon at trial. And the standard that the tax court used was I want to hear from the people that prepared these logs. And if you can't bring them up, I'm going to assume that everything in those logs is a lie, that if I could bring them into the courtroom, they would say that everything in those logs was a lie. Did the people that produced the other 15% testify? They did not, Your Honor. Why not? That's a very good question, Your Honor. I think the short answer is that they were not employees of Green Gas or Pontiac. They weren't even employees of RTC at that point. RTC, through the bankruptcy, had been liquidated. So I'm not sure that... But there were other people that had done 15% of the logs that could have been called and weren't. They could have been called by either side. And the standard under Huffman is are they exclusively under the power of one party? Those witnesses were not. Well, but it's your obligation to support your credit, right? That's clear. You have to provide substantiation for the credit. Right. We have to show that it's a sufficiency standard, not a... You didn't call anybody to support those records. That's not true. We called John Connolly, who was the president of RTC, who was the direct supervisor of the two deceased individuals. But he didn't see them being made. He doesn't know whether they were made. He's just a supervisor. Is that right? Well, I wouldn't say just a supervisor. He's the one that also directed the methodologies that they would use. So I think that in the absence of the people who were dead, who could not be called, he was the logical person, probably the only logical person, that could be called. Right, but the tax clerk found him not to be credible, very self-interested. And it's pretty hard for us to overturn that. Well, except that the reason that the court found Mr. Connolly's testimony not credible was because of the adverse influence. Because he said, I have these logs, the log, but you didn't bring the witnesses, therefore I will conclude that those witnesses would contradict everything you said. And on that basis, I don't find you credible. I'm sorry. I thought the tax court also found him not credible because he was involved in the whole scheme. He wasn't sort of an objective witness. Is that wrong about that? I don't specifically remember that particular point. I take your point however you want. But if you look at the analysis and the substantiation, what it is that the tax court was discussing was the adverse inference, the logs. I do not find Mr. Connolly credible because I am assuming that Mr. Walker and Mr. Johnson, the dead witnesses, would have contradicted. Can you tell me where you get that from? I'm reading on page 107. The partnerships could have corroborated the site logs through testimony of other RTC employees or non-party landfill site managers, yet they chose not to. Although we admitted the site logs under 807A of the federal rules, we conclude that these logs corroborated only by the self-serving testimony of Mr. Connolly have little or no probative value and thus cannot be the basis upon which we can make the Cohen estimate. That's an accurate quote, Your Honor. But this is because of the adverse inference that that's what led the court to that decision. Can you show me the place in the court's opinion where it says that there's an adverse inference because dead people can't testify? That's the part I'm interested in. I don't think there's a reference to dead people not testifying. That's part of the problem. If you look at page 106. I'm using this as a shorthand for the argument we've been discussing. Fair enough. If you look at page 106 of the opinion starting at appendix 316, there's a discussion of Wichita Terminal, which is a tax court case, which is the tax court's adverse inference case. Can you, in the part of the court where the court starts its opinion at 263? Yes, Your Honor. Where after that, where it actually issues its opinion, does it do what you say? I'm not saying it doesn't. It's a long opinion. If you could help me find a spot, that would be great. I guess I'm not following exactly what— You said that in deciding that there was a lack of substantiation, the court said that the people who actually prepared them had to testify, those people are dead, and we're going to hold an inference against the taxpayer here. That would be the section that's starting on page 104, appendix 314, and then continuing through to 317. On 317, they say, appendix 317, partnerships could have corroborated the site logs through testimony of other RTC employees or non-party landfill site managers that they chose not to. Are you saying that couldn't have happened? Well, I am saying that under the applicable standard, because any of those witnesses that were still available, if they were, would not be in Green Gas or Pontiac's exclusive control. That's a different question. The place you're pointing me is exactly the place I quoted you, right? More or less. There's more context before that. It would seem a little harsh for the tax court to say, because you can't produce dead people, unless it's a movie or something, we're going to hold this against you. But that's why I'm asking you to show me where that is. Well, that's exactly what he did. By saying that we don't find Mr. Connolly's testimony because he's not the one that prepared the logs. Okay, so you're answering. He says it's because they're self-serving. He doesn't say because he's not the one. He says because Connolly's testimony is self-serving. There's another place where they don't find him credible at all, but leave that aside. Sorry, go ahead. Go ahead, respond. Okay, look at page 105 of the opinion on 315. There's a discussion about Mr. Connolly was the only RTC employee who testified, did not personally prepare the logs, was not present at the landfills at the time the logs were created, had no means of independently verifying the information on the logs. If you're further up, second, did not offer any testimony from RTC employees who prepared the site logs. Although two of them are now deceased, other employees who prepared the site logs did not testify. The problem is 85% of them, only two people were dead, were the preparers. So that leaves us in this point. Where is that evidence? I am looking at page 105. Where is your evidence? Your 85%? Yeah, the 85% point. Where is that? That is from our brief. We actually, that's not in the opinion, but that is from our brief, and we actually did the, we actually counted them. I can point you to the page. All right. I have the point. On the page 12 of our opening brief, and there are citations to the record at the bottom of page 12. And on the question of the sale and the court's determination that petitioners didn't have the rights to sell the gas, Congress, Peoria, and Springfield, and the bankruptcy, does that consist of all the gas to electric ones? Almost all the electric ones. I think Lyons is not included in that. Okay. You said there was a separate legal error with respect to the gas to electric ones or not so? Well, there was, again, the adverse inference. And there the situation is he concluded that there were no rights to the gas because there was no paper document, there was no paper gas rights agreement. Even though we had, in addition to testimony, bankruptcy court records, of which the court belonged to judicial notice, in which there were discussions of gas rights and gas sales agreements involving those landfills. Actually, some of them were assigned by the bankruptcy court. So I think that is pretty good evidence. The bankruptcy court found that the agreement had expired. Well, I think specifically you're talking about the Pontiac landfill. Yes. Because there are a couple. Right. Specifically with the Pontiac landfill, yes, that is correct. The bankruptcy court did make that finding. That was part of extensive litigation between RTC and Allied, which purchased the Pontiac landfill. And there was litigation in federal district court, in the 7th circuit, in bankruptcy court, in state courts that ultimately led to a settlement agreement, what we call a scattered settlement. As part of that settlement, the parties agreed that the rights to that landfill conveyed as of, I think it's August of 2011. Well, but the parties can't resolve this question. For us, the bankruptcy court said it had expired. So the fact that the parties then agreed for purposes of their deal to go back earlier, that can't bind us. Well, neither does the bankruptcy court ruling. Well, but you were relying on the bankruptcy court's statements by the bankruptcy court to suggest that there was an agreement. Is that what you said before? As evidence, yes, of course. But this court is not necessarily bound by the conclusion that there was for Green Gas and Pontiac. Maybe I should step back for a moment. Green Gas and Pontiac, not RTC. The agreement was between RTC and the landfill. That's what was vitiated by the bankruptcy court in that opinion. We stood in the position of sublessors, essentially, which puts us in a different position. And under Illinois law, which governed that particular landfill's agreements, that could constitute a breach. It does not constitute a voiding of the contract. So from our perspective, from Green Gas and Pontiac's perspective, our position is we were still there. I don't know. My trustee law clerk has found an Illinois state appellate court decision that says that under Illinois law, the termination of a lease terminates all subleases made under the lease. Quote, it is well established that a subtenant, a person holding possession of property by virtue of a lease or a tenant under a top lease, possesses only the rights of such tenant and nothing more. The possession of a subtenant is that of a tenant under the top lease, and the termination of such top lease, ipso facto, works a termination of a sublease. Is that not? That's Arendt v. Lakeview Courts, 51 Illinois Appellate, 3rd 564, quoting an earlier Illinois decision. Where do you get the idea that under Illinois law, the sublease continues after the top lease is terminated? I was looking at two Seventh Circuit cases, which I cite on pages 46 and 47 of the brief, which discuss the law governing contracts of issue, specifically fine Illinois law. And our citation is that rejection of the contract in bankruptcy constitutes a breach, but not an automatic termination. So who do we believe, Seventh Circuit about Illinois law or Illinois law about Illinois law? Who would we believe, the D.C. Circuit about D.C. law? Yes, that's right. I think people would believe D.C. law over the D.C. Circuit. Of course, in the D.C. Circuit, we would have to believe another D.C. Circuit panel, as we just heard in the previous case. But if there were no previous D.C. Circuit panel, we would have to rely on Illinois law, not on another federal court's interpretation. We're getting a little over the edge here, and it's my own fault. I apologize. Can I just clarify one thing? Yes, ma'am. Notwithstanding the unfortunate demise of the two folks that did 85% of the logs, there could have been testimony from other RTC employees or non-party landfill site managers, and your answer, I think, but I want to make sure I've got it right, was that yes, but they weren't in your exclusive control. That's correct. There were people you could have called. Put aside the exclusive control part of that test, but there were other people you could have called and didn't. I don't know, and I think that record doesn't reflect whether they were within the power to summon. I don't know where they are. But I will also say that as far as the site logs, they're signed by one individual, Johnny Johnson or Richard Walker, and my understanding is that that was rather a solitary exercise. Not many people wanted to go to the landfill with them. From your description, we can understand why. That's right, Your Honor. All right, thank you. We'll hear from you in a second. Thank you. May it please the Court, I represent the Commissioner in this case. And the first thing I'd like to start with is one that Judge Garland made, which is that there are independent and alternative grounds for rejecting the credits in this case. There's a statutory interpretation, which goes into production, facility, sales, in service. Then there's substantiation. Can I just be clear about the independence, though? If we agreed with you on the statutory interpretation, and therefore the venting and flaring ones don't work, we would still have to, you don't dispute with respect to the gas to electricity sections that that would be appropriate for a credit if it was substantiated, right? To my knowledge, they got their credits for any electricity that was proven to have been generated based on landfill gas. Proven is a trick word here. Your argument, we would still have to decide whether the tax court was right that there wasn't substantiation with respect to some of those, right? I think, as I understand it, to the extent that electricity, as in not just flared or vented gases, was proven from a landfill, they got credits for it, and that was true for all of the landfills. Aren't they disputing, maybe I'm misunderstanding, aren't they disputing the degree of substantiation required in those gas to electricity? To the extent that they relied on flaring or venting. What about the other? But not for electricity. I see. Well, what about the argument about who owned the property at what point? Right. We'd still have to decide that, wouldn't we? I believe you may need to for Congress, Peoria, and Springfield, only because if you look to A319 to 320, which was the end of the substantiation analysis, the court made some general language about how there was inadequate substantiation for flaring and venting, even at the non-venting landfills, but she only made specific holdings as to two of the non-venting landfills. That's going to be Lyons-McCook and Pontiac. Because the consequence of the attribution decision regarding the missing contracts for Congress, Peoria, and Springfield would justify no credits for those landfills, the tax court didn't make a specific holding as to substantiation at those three landfills. Now, as it happens, because the Final Partnership Administrative Adjustment, or FPAW in this case, actually gave credits for those landfills, the decision did as well. And I don't know that the parties actually went back and said, hmm, would substantiation justify this exact number? Because under the court's holding, zero would have been justifiable, so they just went with what the Final Partnership Administrative Adjustment went with. Now, let me put it to you this way. If you were to reverse everything but substantiation and send it back for recalculation of the decision, I cannot guarantee you that the numbers for Congress, Peoria, and Springfield would be the same. I also cannot guarantee you that they would change by even one cent, is I guess what I would say. So probably if you were trying to do the very minimal, you know, I don't only want to decide, but I actually have to decide, you could decide substantiation and you could decide the contract attribution. And if you rule for the government on those two, you wouldn't have to decide the statutory analysis. Just to be clear on the substantiation, I'm looking at A319, 320? Yes. To conclude on this issue, we do not see evidence produced by the partnerships as sufficient to substantiate the alleged production and sale of LFG from venting, flaring, and non-venting landfills when gas to electricity equipment did not work. Right. So it does seem like there's a substantiation problem when it doesn't work. I do agree with that. I'm just not sure how exactly the parties worked through the numbers or that they just simply adopted what was in the final partnership administrative adjustment. I'm not sure whether the taxpayers would say if substantiation was the only issue, that they would have agreed with the numbers for Congress, Peoria, and Springfield. It might be that they would and maybe that they should, but I cannot tell you for sure that they would. What about the argument that the tax court unfairly corrected a presumption where the only people who could have testified to the satisfaction of the tax court were dead? I don't think that's accurate. First of all, if you look at the course analysis starting with A315 and going through 317, it first starts off by listing off the variety of problems that the commissioner had identified with these site visit logs. And it then says, I agree, these are huge problems. They're sparse. A lot of them have recurring numbers that don't actually make sense given how landfill gas works and causes them not to be credible. And the only witness they put forward was Connolly, who I have found, and they found throughout the opinion, that Connolly lacked credibility, was not reliable, gave self-serving testimony, and specifically here, he didn't have personal knowledge. Then it goes into the adverse inference, which definitely cited that, and says you didn't call other witnesses that you could have called. And it never provided any evidence or any statements to indicate that they couldn't have called these witnesses. And they're the only witnesses who would have known those witnesses were necessary. Only the taxpayers knew that, because we don't get to take depositions before tax court cases. So we didn't know that these site visit logs were only supported in their testimony by somebody who had no personal knowledge, only Connolly. He didn't participate in the site visit logs. We also know that while they say, oh, 85% of these logs were done by these two people, we also know it sounds like there's reason to believe that they relied on landfill operators for at least some of that data. They didn't call those people. The commissioner called some landfill operators. There's no indication that they could not have called landfill operators to try to substantiate some portion of the site visit logs. So, ultimately, this is a case very much like the Escar Corporation case in the Tenth Circuit, where there's a missing evidence of adverse inference put in. And what the court really said, there were a lot of reasons given here to conclude that the commissioner's determination here was correct. And here, the commissioner's determination was there's no substantiation. There, it had to do with the best use of land. But he said, you know, it has to do with the documents that were provided, what the testimony was. And ultimately, we think that the missing witness inference is appropriate because they could have provided other witnesses. They were the only ones who knew they were necessary, and they'd never given any indication that these witnesses were not available to them. But even if you were to conclude that the missing evidence inference... Was it possible that they ever argued that other witnesses were not available? No, I've never seen anything indicating, any indication that says, oh, we would have called this other person, except we couldn't find him. Or this other person refused to come, and we couldn't subpoena him. There was never any indication that they could not have called anybody for any of these site visit logs. The only thing they said is that for these two witnesses that they had passed away. Is there a subpoena authority in the tax court? Excuse me? Is there a subpoena authority for third-party witnesses? I believe that there is. I'm not suggesting there isn't. I don't know. I'm just asking. I believe that there is, but certainly they've never indicated that there was any problem with getting a witness to come and testify. But moreover, you know, they had the burden here. You started a sentence where you said, even if we think there's a problem with the adverse inference, but you never finished it. What's the end of that sentence? The end of that sentence is, this would be harmless error. They have the burden of proof here. They produced inadequate documents that on their face are highly problematic. That on their face, their own witness said, well, if there's repeating numbers, that could mean estimation. That could mean that they got this from some other party. It could mean manipulation. And so you have these documents that are sparse, that lack credibility on their face. And the only witness they brought forward to try to support it and bolster these documents, that it was their burden to provide, had no credibility and no personal knowledge and was self-serving. He's completely tied in. Both the witnesses that they rely on, Connolly and Nichols, the Court throughout the opinion said, you don't have credibility here, and that deserves deference. What about the argument about the respect to the electricity? I'm going to call them electricity ones, so it's clear. Okay. There were witnesses who talked about those agreements, even though they couldn't find the documents, and the Bankruptcy Court made reference to agreements. Okay. Let's start with the witness. That was Connolly, who was found to be not credible here. So what the Court ultimately found here is this. There is really good documentary evidence to show that third parties had gas rights and gas sales rights at Congress, Peoria, and Springfield. But there's no good evidence to show that they lost, that those third parties lost those rights or those rights were given to Green Gas. All you have is Connolly. All you have is his word. Now, in their reply brief, the taxpayers came forward and said, hey, here's Exhibit 5026-P. It's a Bankruptcy Court order where gas sales agreements and gas rights agreements between RTC and Green Gas were assumed and assigned to a successor entity. That means that those contracts exist. Actually, no, it doesn't. The trustee, Steinberg, was actually asked about these, that document, at trial. And this is going to be transcript pages 1311 to 12. And he said... No, we're in what? This is the trial transcript. In the joint appendix? It's not in the appendix because I didn't know they were signing 5026-P when I wrote my brief. I see. But this is in the record because it's in the trial transcript. The record of the tax court. Yes. Could you submit that after you go back to your office today? Will you submit that to us? Yes, attached to a 28-J letter. Yes, that's exactly what I have in mind. Thank you. So this is going to be pages 1311 to 12 from the transcript. He was asked, well, did you look to see if these contracts existed? He says, no. Basically, at the end of a bankruptcy case such as this one, when I'm required to close down basically the business I've been kind of running, I just transfer any interest, if any, to the successor interest. I didn't go look to see if these contracts existed. And then he was asked, well, I don't see the language, if any, in this document. He says, but that's what it means. And, again, this kind of goes to the fact that sometimes you get a court order and it's not necessarily clear the full consequence of what it means. All you know is that any rights were transferred. You don't necessarily know those contracts existed. And certainly the trustee is not telling you that it does. Can I ask you about the statutory issue? Absolutely. Is there a definition somewhere of facility? There really isn't a standard definition of facility. Is there a type of facility? No. I mean, I think that the way that the commissioner has consistently interpreted this statute kind of looks at facility and production and sales and the statutory purpose holistically and says it really needs to be a facility capable of transferring fuel for sale to a third party to use as fuel. And, obviously, when something is being flared or vented,  not for use for any purpose. You know, they mention that, oh, untreated landfill gas could be used for leachate evaporation. The statute doesn't say anything about how the purchaser is supposed to use. Right. If they actually connected it and it went into somebody's, I don't know if it can work this way with methane, but it goes into somebody's truck and they say, thank you very much. I've got my truck full of methane gas now and drive away and vent it, that wouldn't deprive these folks of their tax credit, would it? That's right. But the fact is here for anywhere where there's flaring or venting, it wasn't capable of being transferred to a third party for use as fuel. And that's how the court interpreted it. And we think that that's correct, is that it really needs to be capable of being used by fuel by the purchaser, even if the purchaser then doesn't use it. Now, there's an argument that was made especially strongly in the reply brief to say, oh, actually it was sold and then it was burned off. They told us to burn it off, so we did. This, again, is not entirely accurate based on the documents. If you look at in A622-24 is testimony that said, oh, well, there's this commercial quantity requirement in the contracts and there was no sale until that was met. And we basically sat down and determined that between Connolly and Nichols. But at the end of each six-month period, it was determined was it met, was it not met. And if not, they would have to agree whether there was going to be a sale. But then in the reply brief, the taxpayers come back and say, well, look at Exhibit 37-J, and that shows that their title was transferred as soon as it came out of the ground. Again, I don't really think that it does. If you look at Paragraph 3.2 of that contract, and that's going to be at A868, it specifically says, hey, this is the commercial quantity requirement, and there is no sale for purposes of this statutory provision until such time as the commercial quantity is met or there's an agreement that there will be a sale despite the commercial quantity not being met. So for every landfill that was venting and flaring, there's at least some period where there was no obligation to purchase while gas was coming out. And for some of them, it may not have been determined until really the end of a six-month period, at which point all of the gas that issued for that six-month period had already gone up in the air. So what you really have here is a situation where, you know, RTC determined this is not profitable, let's try to monetize the tax credits, and they just didn't bother to create facilities that could be used for electricity, for transferring methane by pipeline, for storing, for leachate evaporation.  This is part of your argument that I take it the tax court didn't decide that it was a sham, right? That's right. The tax court explicitly said that it was not deciding that issue. That's A214 Note 4. And the fact that there were credits given for electricity, the tax court certainly never decided that that meant, oh, it's not a sham. You know, and I think there's a lot of interpretations that you could have, including the fact that, look, our FPA gave credits for these, and the tax court didn't say, oh, you shouldn't because it was a sham. The court just didn't resolve that question at all. And it's obviously we have reserved it, and we definitely think that if you were to rule against us in any way that gave them any additional credits, it should be remanded for deciding the sham issue. Other questions? Timeline? We'll give you another minute anyway. One minute. Thank you, Your Honor. Addressing the commercial quantities issue, commercial quantities provisions occur in energy contracts across the country, and I think it would be a mistake to accept the Commissioner's agreement here. I would point to the reply brief on page 14 and 15, where we discuss commercial quantities provisions specifically, that that is something that occurs in the industry and certainly does not vitiate the fact of a sale, just like there are all-output take-or-pay contracts in the energy industry, which provide the all-output, whether you can use it or not. That's still a sale, number one. Number two, while my colleague was correct that there are no depositions in tax court, the IRS did conduct an examination and could have contacted anyone who they wanted, and they did. So I disagree that the IRS had no means of contacting any witnesses if they wanted to for any purpose. But you don't disagree the burden is on you to substantiate? I'm sorry, could you repeat that? You don't disagree that the burden of proof is on you in the tax court, not on the IRS? As to substantiation? Yes. That's correct, Your Honor. We believe we met that burden. And I did want to talk about the credibility issue. The tax court did find Mr. Connolly's testimony credible on substantiation issues, specifically this issue of parasitic load. Mr. Connolly made an assumption, a rule of thumb, for the electricity generating plant, saying that, well, if we know that some kilowatt hours have been transferred over, but we know that there's more, we know that electricity had to be expended, actually, to run the generator and so forth, I didn't meter them, I didn't measure it, 10%. And the tax court said, okay, fine, you're credible, I agree with that. Then you go to the non-electricity generating landfills, and no matter what substantiation we provided, the tax court said no. The first one sounds very much like the Cone rule, that everybody agrees that there was going to be another amount of electricity that was required, a parasitic amount, and so forth, it was reasonable to make an estimate. It's different than whether anybody ever actually, and so they're credible, because maybe it shouldn't have been 20%, maybe it should have been 10%, it's just like an expert testifying. The other one is that's not the problem. The problem is whether he's being honest or not, whether he actually saw any of this or not, whether he's making up numbers or not. In a way, that gives us, maybe that gives the tax court more credibility. They accepted the credibility on what seemed like a reasonable estimate, and disavowed credibility with respect to other things that really weren't based on logic, a logical estimate from agreed facts. Except I would suggest that they were. For instance, using the air emissions factors, where you actually do a calculation, well, we know that each vent provides 0.5 to 1.5 cubic feet per meter, and so we have 20 vents, do that calculation. That, just as well, and frankly that has more scientific basis than the parasitic load, which the court accepted. Again, that's a point. Methane release varies over time and hour by hour, so you can't simply just go they have this capacity and multiply it by 20. That was the point. You don't have these stable numbers. That's a fair estimation, and that does bring me to the point of the methane concentration and the stipulation, which is in our brief, and I'm happy to rest on that brief if it's there. I did want to mention that it's, if I may correct my colleague, there were tax credits at the electricity generating landfills that were, that the tax court did disallow on account of this bankruptcy and the contracts issues. I point the court to page 91 of the opinion, A301, for that, and I would be remiss if I didn't at least touch on penalties, because even if it's a technical matter. We had a chance to open on that. I didn't hear a word about penalties from the government just now, so we'll have to rest on the briefs. And if there are no further questions, I thank you. Thank you. We'll take the matter under submission. We'll take a brief break.
judges: Garland, Tatel, Millett